**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02407-MSK-KLM

**DAMON FOREMAN,**

     **Plaintiff,**

v.

**WESTERN FREIGHTWAYS, LLC; and
NEW CENTURY TRANSPORTATION, INC.,**

     **Defendants.**

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment (**# 51**, as amended **# 52**), Mr. Foreman's response (**# 59**), and the

Defendants' reply (**# 64**).

## FACTS

The Court briefly summarizes the facts here, and elaborates as necessary in its analysis.

In March 2005, Mr. Foreman, a black male who was age 62 at the time of the key events herein,

was hired by Defendant Western Freightways ("Western") as an Account Executive.  His job

duties were in the nature of sales, locating customers with loads to ship and persuading them to

use Western to ship them.  Shortly after Mr. Foreman began working at Western, the company

was acquired by Defendant New Century Transportation ("New Century").  The acquisition

resulted in some changes to Mr. Foreman's supervision, but not to his job duties.

1

Beginning in July 2008, the Defendants issued Mr. Foreman a written warning, citing a decline in the sales revenue he was generating.  On  January 30, 2009, the Defendants issued Mr. Foreman two separate written warnings, one for failing to communicate certain information to dispatchers and a second one citing several instances in which Mr. Foreman mishandled dealings with a customer.  In March 2009, the Defendants put Mr. Foreman on a 90-day Performance Improvement Plan ("PIP"), requiring him to make a certain number of calls to customers per month and to improve his revenue generation, among other things.  On June 19, 2009, the Defendants noted that Mr. Foreman had "not achieved the goals as set forth [but had] made some progress," and extended the PIP for an additional 60 days.  In August 2009, the Defendants again advised Mr. Foreman that "your performance continues to remain at an unacceptable level," giving him an additional 30-day extension on the PIP; the Defendants granted an additional 60-day extension on the PIP in September 2009.  On November 25, 2009, still dissatisfied with Mr. Foreman's performance, the Defendants terminated him.

In the meantime, in February 2009, Mr. Foreman lodged complaints with the Defendants' Human Resources Department, raising issues about a discriminatory comment by a supervisor, allegations that he had received inadequate training, and complaints that the discipline imposed against him was unwarranted.  On July 14, 2009 (several weeks after his PIP had been extended for the first time), Mr. Foreman filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission, generally alleging "differential treatment" and specifically complaining about the January 30, 2009 warnings.  Mr. Foreman's charge stated that

"other similarly situated employees have done the same thing and were not similarly disciplined."[1]

Mr. Foreman commenced this action, alleging three nominal claims: (i) a hybrid claim asserting both race discrimination and retaliation in violation of 42 U.S.C. § 1981; (ii) a hybrid claim arising under Title VII, 42 U.S.C. § 2000e *et seq.*, alleging race-based discrimination, a racially-hostile working environment, and retaliation; and (iii) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626.  The Court understands that Mr. Foreman has since agreed to withdraw the age discrimination claim, and thus, the Court does not consider it.

The Defendants now move for summary judgment against Mr. Foreman on all of his claims.  The grounds for that motion are discussed in detail below.[2]

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and

---

[1]     Mr. Foreman filed a second Charge of Discrimination on May 17, 2010, long after his termination.  That charge listed only "retaliation" as the basis for the new charge of discrimination, although the narrative portion mentioned  "a hostile work environment because of my race, color, age, [and] disability" in addition to alleging that his termination was retaliatory.

[2]     The Defendants make a perfunctory argument, unsupported by meaningful legal authority or a significant factual record, that Defendant New Century is not Mr. Foreman's employer. Finding this argument insufficiently-developed, the Court declines to consider it at this time. Should the case proceed to a judgment against the Defendants, the Court will entertain argument and evidence as to the proper person(s) against whom that judgment should run.

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

    If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

    If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Race-based claims

The Court begins with Mr. Foreman's race-based claims – his claims for race discrimination and a racially-hostile working environment under both Title VII and 42 U.S.C. § 1981.  Although Mr. Foreman invokes two different statutes, the analysis of his claims is the same under both.  *See Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000); *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).

### 1.  Hostile environment harassment

The Court begins with Mr. Foreman's claims that he was subjected to a racially-hostile working environment.  To establish this claim, Mr. Foreman must show: (i) that he was subjected to intimidation, ridicule, or insult; (ii) that such conduct was directed at him because of his race; (iii) that the conduct was sufficiently severe, in both an objective and subjective sense, to alter the terms and conditions of his employment; (iv) that it was unwelcome; and (v) that there is some basis to hold the Defendants liable for that conduct.  *See generally Faragalla v. Douglas County School Dist.*, 411 Fed.Appx. 140, 151-52 (10th Cir. 2011) (unpublished), *citing Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008).

Mr. Foreman's racially-hostile work environment claim arises primarily from two alleged comments made by Charlie Zanger, New Century's Vice President of Sales (and Mr. Foreman's supervisor).  The first was made on or about January 12, 2009, while driving to visit a customer

with Mr. Foreman. Mr. Zanger and Mr. Foreman had a conversation about Mr. Foreman's

ownership of horses.  During that conversation, Mr. Zanger remarked to Mr. Foreman, "you

know, you are the first black cowboy I have ever met."[3]  Second, Mr. Foreman testified that two

co-workers, Mark Cole and Jimmy Reed, told him that they had each heard Mr. Zanger use the

word "nigger" on one occasion.[4]  Mr. Foreman admits that Mr. Zanger never used that word in

Mr. Foreman's presence, and his only knowledge of the matter arises from what he was told by

Mr. Cole and Mr. Reed.

      The Court finds that these comments fail to amount to an actionable racially-hostile

working environment.  As to the "black cowboy" reference, the Court cannot say that the remark,

in the context it occurred, amounted to "intimidation, ridicule, or insult" at all.  The exchange, as

characterized by a written statement by Mr. Zanger (which Mr. Foreman cites for its truth),

occurred as part of an otherwise "pleasant discussion"[5] about Mr. Foreman's interests.  Mr.

Zanger recalls that Mr. Foreman "laughed" at the comment and that "our conversation regarding

his travels with his horses throughout the country continued."   Mr. Foreman's own testimony

acknowledges that he "chuckled it off" and did not indicate to Mr. Zanger that he felt the

---

[3]     Mr. Foreman's deposition testimony appears to reflect that, besides being offended by Mr. Zanger's reference to his race, Mr. Foreman was also offended by being called a "cowboy." He prefers the term "equestrian."

[4]     Mr. Cole's affidavit states that in January 2009, Mr. Zanger mentioned that Mr. Zanger's son was in trouble with the law, and Mr. Zanger was concerned that his son "not be in jail with a bunch of niggers."

     Mr. Reed's affidavit states that, in or about May 2008, he was on a sales call with Mr. Zanger when Mr. Zanger "refer[ed] to [Mr.] Foreman as a 'nigger' and a 'black cowboy,'" but provides no further elaboration.

[5]     Mr. Foreman's deposition testimony insists that "it was not a discussion . .  he was asking questions, I was answering them."

comment was inappropriate.  One might (as Mr. Foreman does) maintain that it was unnecessary for Mr. Zanger to acknowledge Mr. Foreman's race when remarking upon his hobbies, and indeed, one might plausibly contend that Mr. Zanger's comment reflects ignorance or stereotypes Mr. Zanger holds about black people, cowboys, or both.  But absent some indicia that the comment was somehow intended by Mr. Zanger to demean or belittle Mr. Foreman, it amounts to little more than a simple acknowledgment by Mr. Zanger of Mr. Foreman's race.

Mr. Zanger's alleged use of the word "nigger" is more troublesome.  There can be no debate that the use of the word is inherently insulting and offensive, and that it has no non-discriminatory use in the workplace.  However, even taking the record in the light most favorable to Mr. Foreman – giving full credence to Mr. Cole and Mr. Reed's contentions – the record nevertheless reflects that Mr. Zanger used the word on only two occasions, neither time in Mr. Foreman's presence.  In *Schwapp v. Town of Avon*, 118 F.3d 106, 110-111 (2d Cir. 1997), the Second Circuit noted that "for racist comments, slurs, and jokes to constitute a hostile working environment, there must be more than a few isolated incidents of racial enmity . . . [rather,] there must be a steady barrage of opprobrious racial comments."  *Schwapp* found more than ten racially-hostile comments over a 20-month period (four of which were made in the black employee's presence, two of those involving the use of the word "nigger," along with several additional instances of that and other epithets being used outside of the employee's presence) sufficiently numerous to permit a hostile environment claim.  By contrast, in *Concey v. New York State Unified Court System*, 2011 WL 4549386 (S.D.N.Y. Sept. 30, 2011) (unpublished), the court found that three instances of a supervisor referring to a black employee as "boy," and another instance of the supervisor mocking the employee's accent, all over a four-year period

7

was insufficiently severe and pervasive to permit a racially-hostile work environment claim to proceed. The *Concey* decision cites to numerous other decisions in which even more frequent use of harsher epithets was also found to be insufficient. *Id., citing, e.g., Steambridge v. City of New York*, 88 F.Supp.2d 276, 286 (S.D.N.Y 2000), *and Holt v. Roadway Package Systems, Inc.*, 506 F.Supp.2d 194, 204 (W.D.N.Y. 2007).

Taking the entirety of Mr. Foreman's allegations as a whole, this Court cannot say that two instances of Mr. Zanger using the word "nigger" outside of Mr. Foreman's presence, plus the instance in which Mr. Zanger referred to Mr. Foreman as a "black cowboy," during a period of more than three-years, rise to the level of an objectively-severe hostile environment. In assessing the objective severity of a course of conduct, this Court considers factors such as the frequency of the offensive conduct; its severity – that is, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). Although two of the remarks here are indefensible, their severity is diminished somewhat by their second-hand nature,[6] and are even further diminished by their infrequency. *Compare Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (co-worker's single reference to black employee as "nigger" and another co-worker remark threatening to report him to the Ku Klux Klan, along with other general insults, insufficiently pervasive to establish racially-hostile work

---

[6]      Admittedly, "derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment." *Hernandez v. Valley View Hosp. Assn.*, 684 F.3d 950, 959 (10th Cir. 2012). However, there are necessarily qualitative differences in severity between: (i) hearing second-hand that a speaker has used a racial epithet when referring to someone else, (ii) hearing second-hand that a speaker has used a racial epithet when talking about the plaintiff employee himself, (iii) the use of a racial epithet by the speaker, in the employee's presence, referring to others; and (iv) the employee being directly addressed with the racial epithet by the speaker.

environment).  None of the remarks in question are physically threatening, and none of them directly interfered with Mr. Foreman's ability to perform his job (*e.g.* if Mr. Zanger made the remarks in order to distract Mr. Foreman from his job duties or disrupt his ability to perform the tasks, or discouraged him from having contact with Mr. Zanger that was essential to carrying out his duties).  Viewing the record as a whole, in the light most favorable to Mr. Foreman, the Court cannot say that he has demonstrated a course of conduct that arises to the requisite level of objective severity.  Accordingly, the Court grants summary judgment to the Defendants on Mr. Foreman's hostile work environment claims.

### 2. Disparate treatment

The Court then turns to Mr. Foreman's disparate treatment claim.  Mr. Foreman contends that the warnings issued to him, his placement on a PIP, and his eventual termination all reflect discrimination against him on the basis of his race.

To establish a claim of disparate treatment discrimination, Mr. Foreman must first establish a *prima facie* case, showing that: (i) he is in a protected class; (ii) he met the objective qualifications for his position; (iii) he suffered an adverse employment action; and (iv) the adverse action arose in circumstances giving rise to an inference of discrimination.  If Mr. Foreman carries that burden, the Defendants are obligated to articulate a legitimate, non-discriminatory reason for the adverse action(s), and Mr. Foreman bears the ultimate burden of showing that the Defendants' proffered reason is a pretext for discrimination.  *See e.g. Barlow v. C.R. England, Inc.,* 703 F.3d 497, 505 (10th Cir. 2012).

The Defendants contend that the warning letters and placement of Mr. Foreman on a PIP do not, of themselves, constitute actionable adverse employment actions, and that his race

discrimination claims should be limited to his termination.  As a general rule, only actions that

result in "a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different duties, or a decision causing a significant change in

benefits" will constitute an adverse employment action for purposes of a disparate treatment

claim. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006).

Numerous cases recognize that placing an employee on a performance improvement program

will not typically constitute an adverse action.  *Id.* at 1224 ("a PIP, standing alone, is not an

adverse employment action"); *Anderson v. Clovis Mun. Schools*, 265 Fed.Appx. 699, 704 (10th

Cir. 2008).  Similarly, a written warning will only constitute an adverse action "if it effects a

significant change in the plaintiff's employment status."  *Anderson*, 265 Fed.Appx. at 704-05,

*citing Haynes*, 456 F.3d at 1224.  A warning that demotes an employee, alters his pay, or

significantly change his responsibilities, on the other hand, might be sufficiently adverse.  *Id.*

Here, neither the warnings issued to Mr. Foreman, nor the PIP, had any significant effect

on his pay, benefits, work assignments, or employment status.   The warning letters simply

informed Mr. Foreman of the factual basis of New Century's concerns, advised him of the policy

New Century intended him to follow, and warned him that further instances of policy violations

"may result in disciplinary measures up to and including discharge."  He does not contend, much

less point to evidence demonstrating, that the issuance of the warnings affected his work or

increased his exposure to potential termination.  Similarly, the PIP recited examples of New

Century's dissatisfaction with his performance, and advised him of specific goals he was

required to accomplish: "increase your daily revenue to your projected revenue goals" (as shown

on an "attached sheet"), "make a minimum of 140 calls a month to different customers," and

"improve your communication with dispatch, rates, and operations."  The PIP did not remove job

duties, reduce Mr. Foreman's pay or benefits, or otherwise expose him to any greater risk of

termination than his performance problems already presented.  Thus, neither the warnings nor

the PIP constitute an adverse employment action.

Mr. Foreman relies on *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.

1998).  There, the court found that an employer's issuance of twenty written warnings to an

employee over a two-year period constituted an adverse employment action because "the record

indicates that the more warnings an employee received, the more likely he or she was to be

terminated for a further infraction."  *Id.  Roberts* does not identify the evidence in the record that

warranted the conclusion, making it unclear whether the case presented a particular company

policy that increased the likelihood of termination (*e.g.* a progressive discipline policy that

escalated potential punishments for future infractions based on prior instances of discipline) or

merely offered the more prosaic situation where an employee who begins to incur repeated

warnings is more likely to face termination simply due to souring relations and hardening

attitudes (both the employee's and management's).  Certainly, the 10th Circuit in *Haynes* did not

understand *Roberts* to stand as a generalized exception to the rule that written warnings do not

typically constitute adverse actions, as *Haynes* expressly distinguishes *Roberts*, finding the

warnings and PIP issued to the employee were not adverse actions.  Thus, the Court finds that

neither the written warnings issued to Mr. Foreman, nor his placement on a PIP, constitute an

adverse employment action sufficient to support a disparate treatment claim.

That leaves only Mr. Foreman's termination as an adverse employment action sufficient

to support a *prima facie* claim.  Because the Defendants have come forward with a legitimate,

non-discriminatory reason for that action – that Mr. Foreman's generated insufficient revenue -- the Court will assume that Mr. Foreman can establish a *prima facie* case. Thus the question is whether Mr. Foreman can show that the Defendants' proffered reason is a pretext for discrimination.

Because the Defendants' stated justification for Mr. Foreman's termination is dissatisfaction with his performance, the Court pauses to acknowledge that the question of pretext is relatively narrow. The Court does not "ask whether [the Defendant's] decision" that Mr. Foreman's performance was unsatisfactory "was wise, fair, or correct." *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010). Employers are permitted to make mistakes in personnel decisions, to make bad or unfair decisions, or to act impulsively or irrationally, so long as an employee's protected classification does not motivate the decision. Thus, it is not sufficient for an employee like Mr. Foreman to show merely that the Defendants "got it wrong"; he must show that the Defendants "didn't really believe [their] proffered reasons for action," such that they "may have been pursuing a hidden discriminatory agenda." *Id.*

An employee attempting to show that an employer's proffered explanation for an action is pretextual must show that the explanation is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude" it to be unworthy of belief. *Id.*, *citing Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008). He may, for example, seek to show that the employer treated similarly-situated of a different protected class more favorably. *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). However, for an individual to be "similarly-situated" to the employee, he or she must be similar in all material respects,

being subject to the same performance standards and the same supervision.  *Amburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Here, Mr. Foreman first addresses the Defendants' contention that his revenue generation figures for 2009 were unsatisfactory by comparing himself to other Account Executives working for the Defendants.  The record indicates the monthly revenue figures for each of 7 Account Executives in 2009, and of those 7, Mr. Foreman's performance is clearly inferior to that of Carl Morgan and Rebecca Neil, each of whom generated nearly twice as much revenue each month as he did.  Mr. Foreman's performance is roughly comparable to that of John Thompson, and somewhat better than that of Mark Cole.  Thus, the Court examines their situations.

The Defendants contend that Mr. Thompson (who is white), is not similarly-situated to Mr. Foreman because he serviced a geographically-large but sparsely-populated territory, which, as Jennifer Hooper testified, "just didn't warrant the kind of revenue that [a] Denver salesman [like Mr. Foreman] did."  Thus, the Defendants' contention is that Mr. Thompson is not "similarly-situated" to Mr. Foreman because he was not subject to the same performance standards or expectations.  Mr. Foreman's response does not refute this contention.  He does not deny that Mr. Thompson's territory provided more challenges or that the Defendants had lower revenue expectations for Mr. Thompson's territory than they did for his.  Mr. Foreman's only reference to Mr. Thompson in his response brief is a statement, unsupported by citation to evidence, that "Defendants make allowances for [Mr.] Thompson, apparently, for his large and sparsely populated territory, [but] no such allowances are given to Damon Foreman for any

13

difficulties with his territories."[7]  Because Mr. Foreman does not specifically dispute that Mr.

Thompson was evaluated according to less-stringent criteria, he is not "similarly-situated" to Mr.

Foreman for pretext purposes.

As to Mark Cole (who is white), the record reflects that Mr. Cole's revenue figures

through 2009 were generally about 20% worse than Mr. Foreman's.  However, the record

reflects that Mr. Cole was also terminated by the Defendants.  Mr. Cole's own affidavit states

that he was terminated in July 2009 because he "was not meeting [his] sales goals."  Thus, far

from supporting Mr. Foreman's contention that the Defendants' explanation for his termination

was a pretext for race discrimination, Mr. Cole's situation somewhat refutes that contention,

insofar as the Defendants also terminated a white Account Executive for the same reasons --

poor revenue generation -- during the same time period.  Indeed, Mr. Cole's affidavit reflects

many of the same complaints that Mr. Foreman levels at the Defendants: that he was never given

any concrete sales quotas by the Defendants, and the quotas that were ultimately given to him

were unrealistically high.  But the fact that the Defendants terminated Mr. Cole badly undercuts

Mr. Foreman's contention here that the bad treatment afforded him was racially-motivated.  It

may be that the Defendants were unfair to or unrealistic about their Account Executives, but Mr.

---

[7]     Because Mr. Foreman's summary judgment response does not follow the Court's format for presentation of such issues, it is not necessarily clear what "difficulties with his territories" Mr. Foreman refers to.  He does make a generalized complaint that the Defendants redrew sales territories on several occasions in 2008 and 2009, depriving him of access to some loyal customers.  However, the same evidence he cites to in support of this assertion – Ms. Hooper's testimony – also establishes that "all of [the Account Executives]" complained about the redrawing of territories.  This leads to the conclusion that all of their sales figures reflected that disruption, and thus, Mr. Foreman's performance relative to his fellow Account Executives necessarily takes that disruption into account.

14

Cole's situation indicates that such unfair or unrealistic treatment was not motivated by the Account Executives' race.

Finally, Mr. Foreman points to the performance of David Eanes and Stephanie Wood. Although both produced less revenue than Mr. Foreman during many of the months of 2009, the Defendants point out that both of these individuals were newly-hired into the Account Executive position in early 2009.[8]  Thus, the Defendants argue, they are true comparators to Mr. Foreman, who had several years of sales experience.  Once again, the Court treats this as a contention that Mr. Eanes and Ms. Wood were not subject to the same performance expectations as he was, and Mr. Foreman cites to no evidence to the contrary. Thus, the Court cannot say that Mr. Foreman has come forward with evidence creating a genuine issue of fact as to whether similarly-situated white Account Executives received more favorable treatment than he did.

Without the ability to turn to similarly-situated comparators, Mr. Foreman's other attempts to show pretext are ineffective.  He complains generally of poor management decisions, such as the redrawing of territories that cut him off from loyal customers, or "favoritism" shown by the assigning of certain lucrative customers to certain Account Executives, but as noted above, the record reflects that such decisions disadvantaged both Mr. Foreman and other white Account Executives equally.  Moreover, as note above, poor management decisions on the part of the Defendants are not indicia of pretext unless they are so unreasonable that the factfinder

---

[8]    Nevertheless, the record reflects that, despite starting in March 2009, Ms. Wood began eclipsing Mr. Foreman's revenue figures by June 2009, and continued to roughly match, if not exceed, Mr. Foreman's monthly revenue totals thereafter.
    Moreover, Mr. Foreman concedes that Mr. Eanes, although never reaching Mr. Foreman's revenue levels, "show[ed] steady increases" in revenue generation throughout the time period.

could not conclude that the Defendants made those decisions in good faith.  That is certainly not the case on the record presented here.

Mr. Foreman is thus left with Mr. Zanger's offensive comments as the only colorable evidence of pretext.  There is some dispute between the parties as to the extent to which various individuals were involved in the decision to terminate Mr. Foreman.  The Defendants point to the testimony of Marc Haney, one of New Century's principals, who stated that "the whole group" – meaning the "sales committee," composed of himself, Len Haney, Rich Luhrs, and Ms. Hooper – "was involved" in making the decision to terminate.  Mr. Haney testified that he could not recall whether Mr. Zanger was present when the decision was made, but that Mr. Zanger (and Angela Haney) was "sometimes" a member of the sales committee, depending on his physical location and the time of the meeting.  Mr. Haney's testimony seems to suggest that a recommendation to terminate Mr. Foreman was presented to the sales committee for discussion, and Mr. Foreman points to an interrogatory response from the Defendants that appears to indicate that the initial recommendation was made to the committee by Ms. Hooper.

Mr. Foreman disputes that the decision was made by a "sales committee," relying largely on the deposition testimony of Len Haney.  Len Haney was asked about "a sales group, or a sales committee that met regularly at [the Defendants] in 2008 and 2009," and he responded that "there were sales meetings, but – all the salesmen and the managers once a week – but there was no committee.  If there was, . . . I didn't know about it."  Len Haney clearly testified that he was not involved in the decision to terminate Mr. Foreman, but he also stated that he did not know who actually made that decision.  Mr. Foreman also disputes that Ms. Hooper initiated the recommendation that he be terminated, pointing to Ms. Hooper's deposition in which she denied

that she "recommend[ed] people for being terminated." Ms. Hooper testified that the decision to terminate Mr. Foreman was made by "senior management," which she identified as Mr. Luhrs, Mr. Zanger, Len Haney, and Marc Haney. She testified that "Len and Marc [and herself] were having a hard time with" the decision, because of their positive personal relationship with Mr. Foreman. Taken in the light most favorable to Mr. Foreman, this testimony suggests both that Mr. Zanger was indeed involved in the decision to terminate, and that he and Mr. Luhr were the primary individuals advocating for Mr. Foreman's termination.

Assuming that Mr. Zanger was part of the decision to terminate Mr. Foreman, if not one of the principal forces behind that decision, the question then becomes whether Mr. Zanger's past use of racial epithets is sufficient to raise a genuine issue of fact as to whether the decision to terminate Mr. Foreman for performance reasons was a pretext for racial discrimination. Taking, as the Court must, all of the evidence in the light most favorable to Mr. Foreman, the Court finds sufficient evidence of pretext to permit Mr. Foreman's race discrimination claim to proceed to trial. Assuming the jury credits the testimony of Mr. Cole and Mr. Reed – that Mr. Zanger twice used the offensive and highly-charged racial epithet "nigger" to refer to black people (and to Mr. Foreman in particular), the jury could very well conclude that Mr. Zanger harbored some degree of racial animus towards black people. The record adequately reflects that Mr. Zanger was directly involved in the decision to place Mr. Foreman on the PIP, and, as noted above, was apparently one of the prime movers in the decision to seek his termination.

Although Len and Marc Haney both ultimately concurred in the decision, and Mr. Foreman has come forward with no evidence to impute discriminatory animus to them, the law recognizes that in certain situations, discrimination can be found where a biased individual

17

"influences [an] unbiased decision-maker" into taking a particular action.[9]  *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 352-53 (6th Cir. 2012).  Here, the jury might reasonably conclude that Mr. Zanger indulged a racial bias against Mr. Foreman, targeted him for termination, and influenced other management staff at the Defendant to concur in that termination when they might not have otherwise done so.  Admittedly, this scenario comes about only when Mr. Foreman's evidence is stretched to its maximum persuasive effect; in reality, Mr. Foreman's claim is relatively weak, and it is entirely possible that the evidence that actually produced at trial differs sufficiently from that presented here to warrant a mid-trial judgment in favor of the Defendants on this claim pursuant to Fed. R. Civ. P. 50.  Nevertheless, the Court finds it appropriate to deny the Defendants' request for summary judgment on Mr. Foreman's race discrimination claim challenging his termination.

   3.  After-acquired evidence

   Because Mr. Foreman's race discrimination claim is proceeding to trial, the Court must address an additional issue raised by the parties.  Discovery in this matter revealed that, while working for the Defendants, Mr. Foreman was simultaneously working for two of the Defendants' competitors: KCP Logistics and Professional Brokers Transportation.  Mr. Foreman never told the Defendants of this arrangement.  Marc Haney testified that such a situation would result in the employee's termination, and Mr. Foreman himself acknowledged that he would

---

[9]   Sometimes referred to as the "cat's paw" theory of culpability, this sort of "transferred animus" has been recognized by the Supreme Court.  *See Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011) ("We therefore hold that if a supervisor performs an act motivated by [prohibited] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable").

"most likely would get fired if [the Defendants] learned that he was" referring customers to competitors.

The Defendants invoke *McKennon v. Nashville BannerPublishing*, 513 U.S. 352, 362-63 (1995), a case in which the Supreme Court recognized that remedies available to an unlawfully-discharged employee could be limited if discovery revealed that the employee had, unbeknownst to the employer, engaged in misconduct during his employment.  To prevail on an affirmative defense of "after-acquired evidence," the employer must "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *Id.*  If the employer meets this burden, the Court may tailor any backpay remedy to fit the circumstances, potentially limiting such award to "the date of the unlawful discharge to the date the new information was discovered," and refusing to order any front pay or reinstatement.  *Id.* at 361-62.  The Defendants seek "summary judgment on that defense," without elaborating as to precisely what form that judgment will take.

Mr. Foreman's response brief contends that "there is a genuine issue of material fact as to whether [he] engaged in misconduct and as to whether that conduct would have resulted in termination," but the record does not support that contention.  Mr. Foreman contends that Marc Haney testified that whether a moonlighting employee would be terminated "would have been evaluated on a case-by-case basis" and "would depend on whether the business competes with [the Defendants]."  But Mr. Haney's actual deposition testimony was unambiguous: "I wouldn't even say competing.  Any [work] in transportation, we would not allow that, working for us and

working for somebody else at the same time." [10]  Pressed on whether his answer would change "if it's not in competition with Western Freightways," Mr. Haney was firm: "I would say no."  He made clear that such conduct would "definitely [result in] termination," and not some lesser punishment.[11]  Moreover, there is no dispute that Mr. Foreman did indeed collect sales commissions from other trucking companies while working for the Defendants.  Mr. Foreman admits as much in his deposition, and the Defendants point to deposition testimony from representatives of the other companies confirming Mr. Foreman's work on their behalf through November 2009.

Thus, it appears to the Court that the Defendants may be entitled to summary judgment in their favor on the merits of their affirmative defense of after-acquired evidence.  However, because the crux of the defense requires an equitable assessment of the circumstances to determine the extent to which any recovery by Mr. Foreman should be limited, the Court declines to formally grant such judgment at this time.  The matter may be raised by the Defendants if and when a jury returns a verdict in Mr. Foreman's favor.

### C.  Retaliation claims

Finally, the Court turns to Mr. Foreman's contention that the Defendants retaliated against him for engaging in protected activity.  These claims are asserted under both Title VII

---

[10]     Mr. Haney conceded that "if a truck driver works for Home Depot on the weekends, then we would understand that.  But sales cannot work for any other company while working [for the Defendants]."

[11]     Mr. Foreman points to evidence that an Account Executive, Carl Morgan, resigned from his job with the Defendants and then informed the management that he had been steering customers to other companies.  Len Haney testified that "it was one of the reasons that we . . . accepted his resignation, because he did work for another company while he was working for Western, without our knowledge."

and § 1981, although the claims "overlap" and are analyzed similarly. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008).

To establish a claim of retaliation, Mr. Foreman must first demonstrate a *prima facie* case, showing: (i) that he engaged in protected activity; (ii) that he suffered an adverse employment action; and (iii) that there is some causal link between the protected conduct and the adverse action. If he carries that burden, the Defendants are obligated to articulate a legitimate, non-retaliatory reason for the adverse action, and Mr. Foreman bears the ultimate burden of demonstrating that the Defendants' proffered explanation is a pretext for retaliation. *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013); *Robert v. Board of County Commissioners*, 691 F.3d 1211, 1219 (10th Cir. 2012).

It is undisputed that Mr. Foreman engaged in protected activity in February 2009, lodging a complaint with the Defendants' Human Resources Department about the January 30, 2009. It is further undisputed that he engaged in a second instance of protected activity on July 14, 2009, filing a charge with the EEOC.

The Court then turns to the question of what adverse actions Mr. Foreman suffered. Although, as discussed above, an employment action must be sufficiently tangible to be considered "adverse" for purposes of a disparate treatment claim, the Supreme Court has held that a more relaxed definition applies to retaliation claims. For retaliation purposes, an adverse action is one which "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe RR Co. v. White*, 548 U.S. 53, 67-68 (2006). Although the action need not affect a change in the terms or conditions of

employment, it must nevertheless rise above the types of "petty slights, minor annoyances, and simple lack of good manners" that are common to many workplaces. *Id.* at 63, 68.

Here, there are two actions that occurred sufficiently close in time to Mr. Foreman's protected acts that examination is warranted. First, the Court observes that his placement on the PIP in March 2009 followed closely after his February 2009 complaint to Human Resources. Second, the second extension of his PIP occurred in August 2009, a few weeks after he filed his EEOC charge. The Court does not, however, consider further Mr. Foreman's termination. Although undoubtedly an adverse employment action, it is far too remote in time to permit an inference that the termination was caused by his EEOC charge some four months earlier. In *Conroy*, the 10th Circuit explained that temporal proximity between the protected act and the adverse action may itself be sufficient to permit a causal inference, but only if the protected conduct was followed very closely in time by the adverse action; a delay of up to one-and-a-half months is sufficient to permit an inference, but a delay of more than three months is not. 707 F.3d at 1181. Because Mr. Foreman's termination occurred more than three months after his protected act of filing the EEOC charge, he must come forward with additional evidence that would demonstrate a causal link between the two events. *Id.* He has not done so.[12]

Thus, the Court turns first to the March 2009 imposition of a PIP. The Court cannot say, under the circumstances presented here, that placing Mr. Foreman on a PIP was the type of action that would discourage a reasonable employee from engaging in protected conduct. The

---

[12]     Mr. Foreman references only the fact that Mr. Zanger was the decision maker with regard to his termination, but does not explain how Mr. Zanger's alleged racial animus somehow correlates to an alleged retaliatory animus. He also makes a vague reference to "the sequence of events leading to discharge" as suggesting causation, but the Court finds nothing so unusual in the sequence of events that an inference of causation may arise.

record reflects that Mr. Foreman had already been warned in July 2008 of his declining revenue numbers and the need to correct his behavior.  The March 2009 PIP was nothing more than a slightly more formalized repetition that July 2008 warning, along with specific instructions on how to correct the problem.  The record does not reflect that the PIP imposed any new requirements or restrictions on Mr. Foreman; he contends that the PIP did not set forth any specific revenue targets that he was required to achieve, other than a simple directive to generate more revenue (just as the July 2008 warning directed him to do), and that he was already making the 140 calls per month required by the PIP.   Nor does the PIP place him at any greater risk of termination than he already faced as a result of the revenue deficiencies he had been advised of nearly a year earlier.  Indeed, if anything, the record reflects that employees might prefer to be placed on a PIP – and thus given notice of a performance defect and an opportunity to correct it -- than to simply be terminated without prior notice for unsatisfactory performance.  In this respect, Mr. Cole's affidavit is significant: he complains that "I was terminated [for] not meeting my sales goals, but I was never given any prior write-ups pertaining to sales goals [and] was never placed on a performance improvement plan."   Accordingly, the Court cannot conclude, on this record, that the March 2009 PIP was an adverse employment action for retaliation purposes.[13]

Even assuming, however, that the March 2009 placement of Mr. Foreman on a PIP was an adverse action for retaliation purposes, Mr. Foreman has not come forward with any evidence to show that the imposition of a PIP was a pretext for retaliation.  The Defendants' stated reason

---

[13]      The Court notes, without necessarily ascribing it any significance, that placement of Mr. Foreman on a PIP in March 2009 certainly did not dissuade him from continuing to engage in protected activity by filing the EEOC charge in July 2009.

for imposing the PIP was that Mr. Foreman's revenue figures had not materially increased since the July 2008 warning notice.  That notice informs Mr. Foreman that his January 2008 revenue was $8,800 per day, that his February 2008 revenue was "your highest to date," and that since April, his revenue had steadily decreased.  It noted that "you are currently at $6,871 dollars a day as of July 17, 2008" and advises him that "I need to see an increase in your revenue."  It does not appear that the record discloses Mr. Foreman's revenue figures for the remainder of 2008, but in the first three months of 2009, before the PIP was imposed, Mr. Foreman's total daily revenue figures were $ 5,116 (January), $ 4,277 (February), and $ 5,362 (March), all of which are significantly below the July 2008 figure of $ 6,871 that the Defendants considered unsatisfactory.  Thus, the record supports the Defendants' stated justification for placing Mr. Foreman on the PIP in March 2009.

Mr. Foreman has not come forward with any evidence to suggest that the complaints about his revenue generation are false, much less that they are a pretext for retaliation.  The July 2008 warning about poor revenue predates any protected activity by Mr. Foreman, and it is undisputed that Mr. Foreman's revenue generation immediately prior to the imposition of the PIP had fallen even further.  Thus, Mr. Foreman has not come forward with evidence to indicate that the Defendants' stated reason for placing him in the PIP – poor revenue generation – is false, and thus, cannot carry his burden of demonstrating that this reason is a pretext for retaliation.  *See e.g. EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1052 (10th Cir. 2011) ("mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment").

The Court then considers the remaining alleged retaliatory act: the August 2009 second extension of the PIP, coming several weeks after Mr. Foreman's EEOC charge.  For the same

reasons stated above, the Court cannot conclude that the extension of the PIP is an adverse

employment action, particularly if the initial imposition of the PIP itself is insufficiently adverse.

Even assuming that it was, the record reflects that the Defendants had previously extended Mr.

Foreman's PIP once already in June 2009, prior to him having filed an EEOC charge.  If the June

extension of the PIP cannot constitute retaliation (and nothing in the record would permit an

inference that it could, given that it is too remote in time from Mr. Foreman's February

complaint), it is impossible to conclude that the Defendants' performing the identical act again

several weeks later was somehow retaliatory.  Mr. Foreman's revenue figures had increased very

slightly immediately prior to the August 2009 extension (rising from $5,275 per day in the month

of June to $5,735 per day in the month of July), but remained well below even the $ 6,871 that

the Defendants considered unacceptable back in July 2008.

Accordingly, the Court finds that the Defendants are entitled to summary judgment on

Mr. Foreman's retaliation claim in its entirety.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 51, 52**) is

is **GRANTED IN PART**, insofar as the Defendants are entitled to judgment on Mr. Foreman's

claims of hostile environment harassment based on race and his retaliation claims, and **DENIED**

**IN PART**, insofar as his race discrimination claim premised upon his termination is sufficient to

proceed to trial.  The parties shall commence preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Final Pretrial Conference.

Dated this 1st day of August, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge